IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

MARK G. MACEK,                          )
                                        )
                  Plaintiff,            )
                                        )
      v.                                )        2:12-CV-197-APR
                                        )
CAROLYN W. COLVIN, Acting               )
Commissioner of the Social Security     )
Administration[1],                      )
                                        )
                  Defendant.            )


OPINION AND ORDER

      This matter is before the court on the petition for judicial review of the decision of the

Commissioner of Social Security filed by the plaintiff, Mark Macek, on May 16, 2013.  For the

reasons set forth below, the decision of the Commissioner is **REMANDED.**

Background

      The plaintiff, Mark Macek, applied for Disability Insurance Benefits on July 24, 2009,

alleging a disability onset date of November 3, 2008.  (Tr. 68)  His claim initially was denied on

December 4, 2009, and again denied upon reconsideration.  (Tr. 68)  Macek requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. 31)  A hearing before ALJ Kathleen

Mucerino was held, at which Macek and vocational expert Randall Harding testified. (Tr. 42-99)

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social
Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically
substituted for Michael J. Astrue as the named Defendant.

1

On February 1, 2011, the ALJ issued a decision denying benefits. (Tr. 11) The ALJ found that Macek was not under a disability within the meaning of the Social Security Act from November 3, 2008 through the date of her decision. (Tr. 11) The ALJ's decision was upheld by the Appeals Council on March 17, 2012, and on May 16, 2012 Macek filed his complaint with this court.

Macek was thirty-three years old at the time of his alleged disability onset. (Tr, 22) He was 6'3" inches tall and weighed 380 pounds. (Tr. 14) Macek attended two years of college and worked as a driver and a loader at UPS for fifteen years. (Tr. 33, 35) Macek had not engaged in substantial gainful activity since his alleged onset date. (Tr. 13)

Macek had a history of back pain complaints, depression, arthritis, and substance abuse. (Tr. 13-22, 293, 297, 331, 340, 498) Macek underwent an MRI on November 25, 2009, which revealed mild discogenic degenerative changes at the lower three lumbar levels with mild L5-S1 foraminal narrowing. (Tr. 367) These results were similar to those from an MRI performed a year earlier. (Tr. 472) A June 5, 2009 CT showed mild multilevel lumbar spondylosis with no evidence of significant central canal stenosis and mild degenerative changes at the bilateral sacroiliac joints. (Tr. 311) A Nuclear Medicine Bone Scan performed the same day showed mild degenerative traumatic joint changes with no evidence of acute bone lesion in the lumbar spine. (Tr. 336) Macek's doctors gave him three steroid injections to alleviate his pain, a medical block, and prescribed physical therapy. (Tr. 253, 272, 290, 307, 324-334)

Macek also was diagnosed with moderate obstructive sleep apnea, obstructive sleep hypopnea, and abnormal sleep architecture. (Tr. 340) Macek saw a psychologist, Anil K. Gandhi, M.D., every one to two months beginning in February 2002. Dr. Gandhi stated that

Macek suffered from Major Depression, Recurrent and Severe, and Alcoholism.  He assigned Macek a GAF score of 35, indicating some impairment in reality testing or communication or a major impairment in several areas such as work or school, family relationships, judgment, thinking, or mood.

Macek also saw a Licensed Clinical Social Worker, Matthew Molenaar, beginning in January 2006, on a semi-regular basis.  (Tr. 374)  An unsigned Mental RFC Assessment stated that Macek was limited moderately in his ability to maintain attention and concentration for extended periods and moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 377)  Keith Magnus, Ph.D. also provided a Psychiatric Review on December 3, 2009, in which he determined Macek was mildly limited in activities of daily living and in maintaining social functioning, and moderately limited in maintaining concentration, persistence, or pace.  (Tr. 391)

At the hearing before the ALJ, Macek testified that he has had back spasms since 2008.  (Tr. 36)  The spasms forced him to bend or slump over and to use a chair or counter to prop himself up.  (Tr. 36)  Macek also had to use a cane to alleviate the feeling that his legs were going to give out and that he was going to fall over.  (Tr. 36)  He usually woke up with a "raging" headache, and he needed to lie down on his right side or sit in his La-Z-Boy chair.  (Tr. 41)  He got nervous, anxious, and paranoid that someone was going to hurt him when he was in social settings.  (Tr. 42)  He stated that he argued with people he was chatting with while playing online games and believed he would have greater trouble getting along with a person face-to-

face.  (Tr. 51)

On November 3, 2008, Macek woke up with numbness in his left leg and flu like symptoms.  He was diagnosed with bulging discs and three popped discs.  (Tr. 43)  He received three epidural steroid back injections to alleviate the pain.  (Tr. 44)  He was referred to a neurologist who prescribed morphine and ordered massage therapy.  (Tr. 44)  The treatment was unsuccessful.  (Tr. 44)   Macek quit seeing the neurologist because he filed for bankruptcy.  (Tr. 44)

As previously stated, Macek began seeing psychiatrist Dr. Gandhi in February 2002.  (Tr. 46)  Macek was hospitalized for his psychiatric issues while under Dr. Gandhi's care.  (Tr. 46-47)  Macek also testified to being tired a lot, having trouble concentrating, and not being able to keep his mind on what he was supposed to be doing.  (Tr. 47)

Macek suffered from sleep apnea and used a BiPap machine, which provided some relief.  (Tr. 45)  He was 6'3" and 380 pounds.  (Tr. 55)  He considered lap band surgery, but he was rejected due to his psychological disorder.  (Tr. 55)

The VE also testified at the hearing.  The ALJ asked what jobs were available to a hypothetical individual limited to light work with the additional limitations of occasionally climbing ramps and stairs; occasional balancing, stooping, crouching, or crawling; never climbing ladders, ropes, or scaffolds; only could understand, remember, and carry out short, simple, one or two step routine instructions or tasks; and could work only in a socially limited environment with no contact with the general public and only necessary contact with co-workers and supervisors.  The VE testified that such an individual would not be able to perform Macek's past work.  (Tr. 58)  That individual would be limited to work that is unskilled, light, and with an

SVP of 2, such as a router, a collator, and small products assembly.  (Tr. 59-60)  Macek's

attorney asked what jobs would be available if that same individual was off task 15% of the time.

(Tr. 61)  The VE testified that this limitation was not a DOT component but based on his

experience, it would eliminate all of the positions.  (Tr. 61)

The ALJ issued her opinion on February 1, 2011.  At step one, the ALJ found that Macek

had not been engaged in substantial gainful activity since November 3, 2008.  (Tr. 13)  At step

two, the ALJ determined that Macek had the following severe impairments: degenerative disc

disease of the lumbar spine with left numbness; depression; arthritis; sleep apnea; and substance

abuse, self-reported and in remission.  (Tr. 13)  At this step, the ALJ explained that Macek had

hypertension and received medical refills.  However, the treatment notes did not document any

severe side effects, and an EKG and stress test had normal results and negative findings of

ischemia and arrhthmia.  (Tr. 13)  The ALJ determined that Macek's hypertension was under

control.  The ALJ also explained that she did not consider headaches as a severe impairment

because chronic headaches were not supported by the medical evidence and Macek made few

complaints to his doctors about headaches.  (Tr. 14)

At step three, the ALJ determined that Macek did not have an impairment or combination

of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart

P.  (Tr. 14)  The ALJ first considered Listing 1.04, disorders of the spine.  The ALJ explained

that Macek did not meet this Listing because his back impairment did not result in a compromise

of a nerve root or spinal cord with evidence of nerve root compression characterized by nero-

anatomoic distribution of pain, limitation of motion of the spine, or motor loss accompanied by

sensory or reflex loss.  (Tr. 14)  Additionally, Macek's back pain did not result in an inability to

ambulate effectively because although he used a cane, it was not prescribed and the medical evidence did not support the use of a cane.  (Tr. 14)

The ALJ next considered Macek's obesity in combination with his other impairments. (Tr. 14)  The ALJ acknowledged that Macek had a BMI of 43.7, making him morbidly obese. (Tr. 14)  However, he was able to ambulate effectively and independently.  (Tr. 14)  For this reason, the ALJ did not find that Macek's impairments when considered in combination with his obesity satisfied a Listing.  (Tr. 14)

The ALJ next stated that Macek's mental impairments did not meet or equal Listing 12.04 or 12.06.  (Tr. 14)  The ALJ explained that Macek did not satisfy the Paragraph B criteria. (Tr. 14)  Macek had a mild restriction in activities of daily living.  (Tr. 15)  He lived alone and took care of his young daughter weekly.  (Tr. 15)  He cleaned, did laundry, watched television, played x-box, drove, and read.  (Tr. 15)

In social functioning, Macek had mild difficulties.  (Tr. 15)  Despite having depression, Macek was able to work around others, saw his young daughter, talked on the phone regularly, went out daily, and participated in a fantasy football league.  (Tr. 15)

The ALJ determined that Macek had moderate difficulties with concentration, persistence, or pace.  (Tr. 15)  Macek read books and understood the content, participated in computer activies and games daily, played x-box, and watched television.  (Tr. 15)  Due to his medication and depression, the ALJ determined Macek had a moderate limitation.  (Tr. 15)

The ALJ stated that Macek had no episodes of decompensation that were of an extended duration.  (Tr. 15)  Because Macek did not have at least two marked limitations or one marked limitation and repeated episodes of decompensation, the Paragraph B criteria were not met.  (Tr.

6

15)

The ALJ also considered the Paragraph C criteria and determined that the evidence did not support that the Paragraph C criteria was met.  (Tr. 15)  The evidence did not show that Macek needed a highly supportive living arrangement because he lived alone and took care of his daughter weekly  (Tr. 15)  He had no episodes of decompensation, and there was no evidence that suggested that a minimal increase in mental demands or change in environment would cause him to decompensate.  (Tr. 15)  Furthermore, Macek was able to function independently outside of his home.  (Tr. 15)

The ALJ determined that Macek had the residual functional capacity (RFC) to perform less than a full range of light work.  (Tr. 16)  Macek occasionally could climb ramps, climb stairs, balance, stoop, kneel, crouch, or crawl; never could climb ladders, ropes, or scaffolds; could understand, remember, and carry out short, simple, one or two step rote, routine instructions or tasks; and was limited to working in a socially limited environment defined as no contact with the general public and only necessary contact with co-workers and supervisors.  (Tr. 16)  In reaching this decision, the ALJ explained that she followed a two-step process in which she first determined whether there was an underlying medical physical impairment that could be expected to produce the claimant's pain or symptoms.  (Tr. 16) Once an impairment was identified, she evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent they limit the claimant's functioning.  (Tr. 16)

The ALJ first summarized Macek's complaints.  (Tr. 16) Macek stated that he was unable to work due to a bulging disc in his lower back, arthritis, and depression.  (Tr. 16)  He stated that his back injury prevented him from standing or sitting in one position, that he could walk for

only twenty minutes, and that he could not lift more than 20 pounds.  (Tr. 16)  He received three steroid injections, but they did not help much and he was not a candidate for surgery.  (Tr. 16)  His depression affected his daily activities, but therapy, medication, and rest helped.  (Tr. 16)  He took Wellbutrin, Darvocet, Effexor, and Tylenol with drowsiness.  (Tr. 16)  He spent most of his day in the recliner or on the couch watching television, reading, or playing x-box.  (Tr. 16)  He did some laundry and dishes and cooked simple meals.  (Tr. 16)  He lived alone but his six year old daughter visited weekly.  (Tr. 16)  He used a cane when needed for his back spasms and to prevent a loss of balance.  (Tr. 16)   He went out daily by walking, driving, or riding in a car.  (Tr. 16)  He previously abused alcohol but had not drunk in about two years.  (Tr. 16)  He had trouble around people and sometimes became nervous and anxious.  (Tr. 16)  He also reported problems concentrating.  (Tr. 16)  He went to Catholic Charities for inpatient treatment in the past.  (Tr. 16)

Macek's mother, Maureen Schultze, was next to testify.  (Tr. 17)  She reported that Macek watched television, went online, attended doctors' appointments, and talked on the phone.  (Tr. 17)  His back pain affected his ability to squat, bend, stand, reach, walk, sit, kneel, and climb stairs.  (Tr. 17)  His depression affected his ability to complete tasks, concentrate, and get along with others.  (Tr. 17)  He had sleep apnea, nightmares affected his ability to sleep, but he used a BiPap machine to help sleep.  (Tr. 17)  Schultze also reported that Macek heard voices occasionally.  (Tr. 17)

The ALJ went on to recap Macek's medical notes.  (Tr. 17)  Macek had diagnostic testing completed in 2009 for his back pain and numbness.  (Tr. 17)  A CT scan of his lumbar spine revealed mild multilevel lumbar spondylosis without evidence of significant central canal

8

stenosis.  (Tr. 17)  He had mild degenerative changes at the bilateral sacroliliac joints.  (Tr. 17)

His hip and pelvis testing showed negative findings.  (Tr. 17)  His bone scan revealed mild

degenerative or traumatic joint changes without evidence of acute bone lesions in the lumbar

spine.  (Tr. 17)  EMG studies of his bilateral lower extremities revealed irritability in the right S1

myotome consistent with an S1 radicupathy, but no significant active axon loss was noted.  (Tr.

17)  Macek underwent physical therapy and steroid injections for his pain and left radicuopathy.

(Tr. 17)

On June 3, 2009, Macek underwent a sleep study that revealed moderate severe

obstructive sleep disorder breathing and moderate obstruction sleep apnea.  (Tr. 17)  The

consistent use of BiPap was recommended with weight loss.  (Tr. 17)

Macek had a repeat MRI and EMG in 2009.  (Tr. 17)  His MRI revealed mild disc

degeneration at L3-4, L4-5, L5-S1 levels with some mild bulging.  (Tr. 17)  There were some

mild to moderate foraminal stenosis, particularly at the L3-4 level.  (Tr. 17)  The EMG testing

revealed irritability in the left S1 myotome without meeting full electrodiagnostic criteria for an

active left S1 radicuopathy.  (Tr. 17)  The surgeon's opinion was that surgery was not needed.

(Tr. 17)  He referred Macek back to Dr. Adlaka for long-term pain management strategies.  (Tr.

17)

With regard to Macek's depression, he began seeing Dr. Gandhi in 2002, and started

counseling with a therapist.  (Tr. 17)  He had voluntary inpatient treatment on August 11, 2005.

(Tr. 17)  Dr. Gandhi made a diagnosis of major depression, recurrent, ruled out alcoholism, and

assigned a GAF score of 40 upon admitting Macek to the hospital.  (Tr. 17)  Macek was admitted

with suicide precautions and received inpatient treatment for four days.  (Tr. 17)  Dr. Gandhi

took Macek off Lexapro and placed him on Effexor with continued use of Wellbutrin.  (Tr. 17)

Macek reported seeing Dr. Gandhi on a monthly basis beginning in 2005 and his psychologist on

a weekly basis beginning in 2006 or 2007.  (Tr. 17)

      Macek underwent a psychiatric evaluation with Irena Walters, Psy.D. on November 10,

2009.  (Tr. 17)  Dr. Walters observed that Macek was alert, oriented, and cooperative.  (Tr. 17)

He walked slowly and had normal posture.  (Tr. 17)   His speech rate and tone were normal with

good eye contact.  (Tr. 17)  Macek reported that he was able to groom, bath, and dress himself

but that he did not do so daily because he did not go out.  (Tr. 17-18)  Macek slept two to six

hours a night with interruptions and took two or three naps weekly.  (Tr. 18)  He reported

fatigue, loss of energy, and a loss of interest in activities since 1977.  (Tr. 18)  He experienced

feelings of helplessness and hopelessness since 1997.  (Tr. 18)  Macek reported that he primarily

microwaved his food or ate carry-out.  (Tr. 18)  Because of his back and depression, he did not

do many chores.  (Tr. 18)  He went to the store on his own once or twice a month, had a

housekeeper come once a month, and did laundry on a weekly basis.  (Tr. 18)  Macek liked video

games and reported driving to his doctors' appointments.  (Tr. 18)  He was able to calculate

change but was not good with money management.  (Tr. 18)  He reported poor concentration and

his perseverance was fair.  (Tr. 18)  He was not dating, but he got along with his family and was

able to get along with people generally.  (Tr. 18)  He described his typical day as showering,

taking medication, eating, and going to therapy.  (Tr. 18)   Once he returned home, he ate,

watched television, listened to music, read, or played video games.  (Tr. 18)  He also went online

and checked his mail.  (Tr. 18)

      At his mental status examination, Macek was able to recall three out of three cities after

five minutes.  (Tr. 18)  He was able to repeat five digits forward and four digits backward.  (Tr. 18)  His simple math calculations were correct, but his serial 7's and 3's were inaccurate and stopped because he had to rely on his fingers to calculate.  (Tr. 18)  He had appropriate insight and judgment.  (Tr. 18)  Dr. Walters diagnosed Macek with depressive disorder, NOS, dysthymia, and psychosis, and assigned a GAF score of 60 to 65.  (Tr. 18)

The ALJ next explained that she found the Macek's medically determinable impairments could be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC.  (Tr. 18)  The ALJ stated that she took the objective medical evidence, medical treatment, medications, activities of daily living, work history, and credibility factors listed in SSR 96-7 into consideration when rendering her credibility determination.  (Tr. 18)  The ALJ explained that Macek continued to work for years with depression and had significant earnings until he injured his back.  (Tr. 18)  The ALJ concluded that Macek's back injury predominately affected his ability to work and that the medical evidence reflected that Macek was able to work in a different capacity than he had in the past and within the confines of the RFC.  (Tr. 18)

The medical evidence and diagnostic testing supported some pain and limitations from his back, but the ALJ found that the findings suggested only mild problems.  (Tr. 19)  Although Macek had limited success with physical therapy, his rehabilitation potential was good.  (Tr. 19)  He went for two surgical opinions, and both specialists indicated that he was not a candidate for surgical intervention.  (Tr. 19)  Macek took Darvocet and other pain medication with few complaints of side effects.  (Tr. 19)  Although he reported side effects from Lyrica, this

11

medication was discontinued.  (Tr. 19)  At his physical examination with Dr. Joseph Spott, he had good coordination with normal gross sensations.  (Tr. 19)  His psychiatric examination revealed that he was oriented times three with appropriate mood and affect.  (Tr. 19)  Macek had full muscle strength, deep tendon reflexes of 2+, and a normal upper extremity, hand and wrist, and lower extremity examination.  (Tr. 19)  Macek had a full range of motion, normal inspection and palpation without tenderness, and normal straight leg raises bilaterally.  (Tr. 19)  Macek's pelvic rock test was abnormal bilaterally.  (Tr. 19)  Dr. Richard Cristea also noted that Macek's gait was stable with motor 5/5 and negative straight leg tests.  (Tr. 19)  Based on these notes, the ALJ concluded that the treatment notes did not support Macek's complaints of pain and functional limitations because the notes did not support problems with balance, the need to elevate his legs, or the use of a cane.  (Tr. 19)

The ALJ further explained that the treatment notes were conservative overall, and that the physical examinations did not support the inability to work.  (Tr. 19)  Throughout the treatment records, it was not noted that Macek was in any acute distress, and the notes did not support an inability to engage in physical activities as he described.  (Tr. 19)  The ALJ explained that the medical evidence did not support ongoing problems with sleep or the use of a BiPap.  (Tr. 19)  In June 2009, Macek reported sleeping longer at night and taking fewer naps.  (Tr. 19)  The ALJ further explained that Macek still was able to work for years while reporting fatigue and tiredness.  (Tr. 19)  The ALJ acknowledged that Macek also had obesity, back pain, and sleep apnea, and for these reasons, the ALJ limited Macek to light work with occasional posturals, with no climbing of ladders, ropes, or scaffolds.  (Tr. 19)

The ALJ also noted that she considered Macek's treatment for his depression and

12

anxiety.  (Tr. 19)  The ALJ explained that she did not have any ongoing treatment notes from Macek's counselor or psychiatrist.  (Tr. 19)  The ALJ further stated that Dr. Cristea noted that Macek was alert and oriented times three.  (Tr. 19)  Dr. Cristea also recorded some anxiety and recommended Ativan and a follow-up with a psychiatrist, but the ALJ determined that this was not noted on a consistent basis and anxiety was not diagnosed by Macek's treating psychiatrist or therapist.  (Tr. 19)  The mental status examination performed by Dr. Walters revealed that Macek was able to perform various activities that involved focus and concentration.  (Tr. 19)  Macek also continued to drive, care for his daughter, and engaged in activities he enjoyed.  (Tr. 19)

The ALJ next explained that she did not find Macek credible because his conservative treatment and the activities he engaged in undermined his allegations of an inability to work.  (Tr. 20)  The ALJ also explained that she found his mother's testimony inconsistent on its face.  (Tr. 20)  Schultze identified activities that Macek engaged in that would require concentration and completing tasks, such as caring for his young daughter independently, living on his own, and reading.  (Tr. 20)  The ALJ noted that the problems Schultze identified did not occur constantly.  (Tr. 20)  The ALJ also explained that she discredited Schultze's testimony in part because she was not a disinterested party.  (Tr. 20)

The ALJ gave great weight to the opinion of the state agency medical consultant.  (Tr. 20)  Dr. Mangala Hasanadka considered the diagnostic and clinical findings of Macek's specialist.  (Tr 20)  Dr. Hasandanka reported that she considered Macek's treating doctor's opinion that Macek could not return to his past work at UPS.  (Tr. 20)   Dr. Hasanadka concluded that Macek had the RFC to perform light work with occasional posturals and no

13

climbing ladders, ropes, or scaffolds.  (Tr. 20)   A state agency medical consultant, Dr. M. Brill, affirmed Dr. Hasanadka's opinion on March 19, 2010.  (Tr. 20)   The ALJ assigned Dr. Hasanadka's opinion great weight because it was affirmed a year later despite additional medical evidence and more diagnostic findings.  (Tr. 20)

The ALJ discredited the opinion of Macek's treating physician, Dr. Anil Gandhi, finding it inconsistent with Macek's own.  (Tr. 20)  Dr. Gandhi believed Macek had not worked since November 2008 due to his mental problems.  (Tr. 20)  However, Macek testified that his alleged onset date and the last day he worked corresponded with his back injury.  (Tr. 20)  Dr. Gandhi also noted that Macek resorted to drinking to self medicate his depression, but Macek testified that he quit drinking two years ago.  (Tr. 21) Dr. Gandhi's mental status examination revealed that Macek was very pleasant and had a friendly demeanor.  (Tr. 21) Macek was oriented times three and had poor concentration.  (Tr. 21) He had an intact long-term memory, but his short term memory was affected.  (Tr. 21) Macek was able to get one out of three items in five minutes, his speech was within normal limits, and his judgment and insight were intact.  (Tr. 21) There was no evidence of hallucinations or delusions, and Macek's intellect was average.  (Tr. 21) The ALJ noted that Macek had taken various psychotropic medications but took Wellbutrin SR 200 mg twice daily, Effexor XR at bedtime, Rozerem to help sleep, and Campral for alcohol cravings at the time of the hearing.  (Tr. 21)

Dr. Gandhi diagnosed Macek with major depression, recurrent, severe alcoholism, and dependent personality, and assigned him a GAF score of 35.  (Tr. 21) The ALJ stated that she found it noteworthy that Dr. Gandhi assigned a GAF score of 35 at Macek's mental status examination because it was lower than his GAF score when he was hospitalized for mental

14

illness.  (Tr. 21) The ALJ explained that the GAF score appeared inconsistent with the totality of

the evidence, and she referred to the GAF score of 60 that Dr. Walters assessed.  (Tr. 21)

The ALJ next acknowledged that Dr. Gandhi stated that Macek was disabled and had

been for the past couple of years.  (Tr. 21) However, Dr. Gandhi's treatment notes were not part

of the record.  (Tr. 21) The ALJ explained that Macek's mental status examinations had

remained consistent over the years.  (Tr. 21) The ALJ noted that Macek had been able to work in

the past, which was inconsistent with Dr. Gandhi's opinion.  (Tr. 21) Macek also had extensive

activities of daily living, which was inconsistent with Dr. Gandhi's opinion and his GAF

assessment.  (Tr. 21)   For all of these reasons, the ALJ did not give controlling weight to Dr.

Gandhi's opinion, although she did give his opinion some weight.  (Tr. 21)

The ALJ stated that she made accommodations for Macek's poor concentration and

problems with short-term memory.  (Tr. 21) However, the ALJ explained that Macek's

psychiatric examination with Dr. Walters was somewhat inconsistent with short-term memory

problems.  (Tr. 21) Macek was able to recall three cities out of three after five minutes.  (Tr. 21)

He could repeat five digits forward and four backward.  (Tr. 21) The ALJ also noted that Macek

had intact judgment, insight, and long-term memory, with average intelligence.  (Tr. 21)  The

ALJ found that Macek was able to understand, remember, and consistently carry out short,

simple, one to two step rote, routine instructions or tasks.  (Tr. 21) The ALJ stated that this was

inconsistent with the opinion of the state agency mental health consultants.  (Tr. 21)

The ALJ next discussed Dr. Keith Magnus' opinion that Macek's medically determinable

impairments reasonably could be expected to produce the alleged symptoms, but the intensity of

the symptoms and their impact on functioning were not consistent with the totality of the

15

evidence.  (Tr. 21) Rather, the evidence suggested that Macek could understand, remember, and carry out simple tasks.  (Tr. 21) Macek could relate, at least superficially, on an ongoing basis with coworkers and supervisors.  (Tr. 21)  Macek could attend to tasks for sufficient periods of time and complete tasks.  (Tr. 21) Macek also was able to manage the stresses involved in simple work.  (Tr. 21)

The ALJ explained that Dr. Magnus supported his opinion with the treatment Macek received, clinical findings, and activities of daily living.  (Tr. 21) Dr. Magnus considered Dr. Gandhi's opinion that Macek was disabled and indicated that it was not consistent with Macek's activities of daily living.  (Tr. 21) The ALJ agreed with this statement.  (Tr. 21) Dr. Magnus stated that Macek had the ability to perform a wide range of tasks without difficulty.  (Tr. 22) Macek could drive, read, clean the house, cook, shop, do laundry, manage finances, use the computer, do dishes, focus on television, and care for his child.  (Tr. 22) He was sociable, cooperative, able to get along with others, and could tolerate casual interactions necessary to perform tasks.  (Tr. 22)  Macek also had a long work history.  (Tr. 22) The ALJ gave Dr. Magnus' opinion great weight, stating that it was consistent with the evidence of record and Macek's history.  (Tr. 22)   Another state agency mental health consultant, J. Gange, Ph.D., affirmed this opinion on March 25, 2010.  (Tr. 22)

The ALJ also explained that she considered the opinion of Matthew Molenaar, LCSW, who was Macek's counselor.  (Tr. 22) The ALJ stated that Molenaar was not an appropriate medical source but that she gave his opinion a little weight.  (Tr. 22) The ALJ noted that she did not have treatment notes from Macek's counseling sessions to support Molenaar's opinion.  (Tr. 22) Molenaar indicated that Macek had suicidal ideations but that they never  were strong

16

enough to merit hospitalization.  (Tr. 22) Macek made broad statements which indicated that he had emotional, physical, and financial distress that prevented him from handling his job at UPS. (Tr. 22) His emotional distress impaired his ability to focus, concentrate, and persist at difficult tasks for an extended period of time.  (Tr. 22) The ALJ noted that Macek discussed his job at UPS specifically, and not other jobs.  (Tr. 22) Molenaar noted that Macek was unable to persist with difficult tasks.  (Tr. 22) The ALJ explained that Macek's RFC was consistent with these findings because it allowed for simple, one to two step rote or routine tasks, and not complex ones.  (Tr. 22) Macek's RFC also would preclude his work at UPS.  (Tr. 22) Molenaar also indicated that Macek always had eating and sleeping problems with fatigue but that most of his other symptoms were noted as sometimes or often.  (Tr. 22) The ALJ concluded that the RFC was consistent with Molenaar's opinion.  (Tr. 22)

The ALJ summed up her RFC assessment, stating that "the assessed residual functional capacity is supported by the medical findings, nature and frequency of treatment, the claimant [sic] activities, work history and medical opinions of record.  The claimant is capable of sustaining competitive work consistent with the residual functional capacity set forth in this decision."  (Tr. 22)

At step four, the ALJ determined that Macek was unable to perform any past relevant work.  (Tr. 22) At step five, the ALJ found that there were jobs that existed in the national economy that someone of Macek's age, education, work experience, and RFC could perform, including clerical/router (1,200 jobs regionally), collator/scanner (1,300 jobs regionally), and small products assembler (400 jobs regionally).  (Tr. 23)

17

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012)*; Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013)*; Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that he is unable

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

18

**42 U.S.C. § 423(d)(1)(A)**.

The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 404.1520.** The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. § 404.1520(b).** If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 404.1520(c).** Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. § 404.1520(e).** However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).**

Macek first argues that the ALJ improperly assessed his RFC by failing to consider the limiting effects obesity had on his ability to function. Even if a claimant does not contend that obesity is one of his impairments, SSR 02–1p requires that the ALJ consider the "incremental

19

effects" of obesity on the claimant's other conditions and limitations.  *See **Gentle v. Barnhart***, 430 F.3d 865, 868 (7th Cir. 2005). However, the failure to consider these effects explicitly can be "harmless error." ***Prochaska v. Barnhart***, 454 F.3d 731, 736 (7th Cir. 2006).  For example, in ***Prochaska***, the Seventh Circuit concluded that the ALJ sufficiently analyzed the claimant's obesity by implicitly considering the issue by relying on the medical documents that noted the claimant's height and weight.  Because the claimant did not specify how obesity specifically impaired her work ability, the Seventh Circuit found that any error on the ALJ's part in not explicitly considering the claimant's obesity was harmless. ***Prochaska v. Barnhart***, 454 F.3d at 737. *See **Skarbek v. Barnhart***, 390 F.3d 500, 504 (7th Cir. 2004) (ALJ's adoption of limitations suggested by doctors who were aware of claimant's obesity, plus claimant's failure in specifying how weight impaired the ability to work, was harmless error).

     The record shows that the ALJ took Macek's obesity into account and considered it in conjunction with Macek's other impairments to determine whether he satisfied a listed impairment.  Specifically, the ALJ noted that Macek was morbidly obese and had a BMI of 43.7. However, Macek was able to ambulate effectively and independently.  (Tr. 14)  In the RFC determination, the ALJ explained that weight loss was recommended to help with Macek's sleep apnea.  The ALJ also stated that she recognized Macek's  "obesity, back pain and sleep apnea and limited him to light work with occasional posturals with no climbing of ladders, ropes or scaffolds."  (Tr. 19)  Moreover, the ALJ cited to numerous physicians' notes, both those prepared by Macek's treating physicians and the state agency physicians, that accounted for Macek's obesity and its effects.  Therefore, the ALJ both explicitly and implicitly considered Macek's obesity when determining his RFC.

Macek specifically challenges whether the ALJ considered the effect of his obesity on his sleep apnea, arguing that the ALJ's RFC finding did not account for his need to take a nap two or three times a week.  However, the ALJ acknowledged that Macek spent his day on the recliner or on the couch, that Macek's mother reported that he had difficulty sleeping, and that Macek was diagnosed with moderate sleep apnea.  The ALJ also noted that weight loss was encouraged with use of the BiPap machine.  However, the ALJ explained that Macek's sleep apnea improved with the use of the BiPap machine, that he was able to maintain work in the past even though he had difficulty sleeping, and that no medical source believed he suffered additional limitations from fatigue.  Because the ALJ specifically considered Macek's sleep apnea and acknowledged that obesity affected it, she provided sufficient reasoning for her finding and remand is not warranted on this issue.

Macek next argues that the ALJ improperly evaluated his credibility.  This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007);  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such

as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. §404.1529(a); *Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir.2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. §404.1529**( c); *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005)("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.")

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1.  *See also **Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the

22

fact that its source is purely psychological does not disentitle the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  (internal citations omitted).

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994); *see also Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, she must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, at *2.  *See Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  She must "build an accurate and logical bridge from the evidence to [his] conclusion."  *Zurawski*, 245 F.3d at 887 (*quoting Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both

23

the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Macek complains that his daily activities were not inconsistent with his complaints of pain because they involved mostly indoor, stationary activities, including watching television, playing x-box, reading books, talking on the phone, and going online. Macek argues that the ALJ failed to explain how these restrictive activities demonstrated that he was not suffering from disabling pain.

Upon review of the ALJ's opinion, it appears that the ALJ broke up her credibility determination between Macek's physical and mental ailments. The ALJ explained that the medical evidence and diagnostic testing supported some pain and limitations from Macek's back impairment but that the diagnostic findings suggested only mild problems. Macek's rehabilitation potential was indicated as good, and two surgical specialists stated that he was not a candidate for surgery. The ALJ also summarized Macek's physical examination results, which noted normal range of motion, full muscle strength, no instability, a normal straight leg raising test, and the ability to walk on heels and toes with no difficulty. She then concluded that the notes did not support problems with balance, the need to elevate his legs, or the use of a cane.

Later, the ALJ discussed Macek's mental impairments, including depression. She then stated that Macek's conservative treatment and daily activities were inconsistent with the limitations he described. She explained that she did not have treatment notes from Macek's counselor or psychiatrist, but that the mental status examination and reports prepared by Dr. Walters showed that Macek was able to perform various activities that involved focus and

concentration, including driving, caring for his daughter, and engaging in activities that he enjoyed.  The ALJ also noted that Schultze testified that Macek could perform many activities that required concentration and completing tasks.  For example, he was able to care for his young daughter independently, live on his own, and read.

The ALJ separately pointed to evidence that contradicted Macek's complaints of physical pain and his testimony regarding his inability to concentrate.  The ALJ's reliance on Macek's daily activities was used to show that he had a greater ability to concentrate than he claimed rather than to show that his physical abilities exceeded his testimony.  The ALJ specifically mentioned that these activities contradicted his complaints of inability to concentrate, both in conjunction with reviewing his testimony and Schultze's testimony.  The ALJ did not state that these mostly stationary activities displayed a greater physical ability.  Rather, the ALJ relied on the mild diagnostic findings to contradict Macek's testimony regarding his physical abilities.  The ALJ adequately explained these inconsistencies and the basis of her credibility determination, and the court finds that the ALJ's reliance on Macek's daily activities to show a greater ability to concentrate was well supported.  The ALJ need not readdress this issue on remand.

Macek next complains that the ALJ failed to account for his moderate limitations in concentration, persistence, and pace. Dr. Magnus filled out a mental RFC assessment.  He determined that Macek had a moderate limitation in the areas of maintaining concentration and attention for extended periods and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  He commented that the evidence

25

suggested that Macek could understand, remember, and carry out simple tasks, and that he could relate, at least superficially, on an ongoing basis with coworkers and supervisors.  The ALJ translated this assessment into her RFC finding, limiting Macek to jobs that required no more than simple, one to two step rote, routine instructions or tasks.  Macek complains that the ALJ did not explain how she determined this limitation and, likewise, failed to incorporate the correct limitations in the hypotheticals she proposed to the VE, rendering her step 5 finding erroneous.

The Commissioner responded that the ALJ relied upon the opinion of a state agency reviewing physician who translated Macek's moderate limitations in concentration, persistence, or pace into the RFC the ALJ adopted.  *See Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (explaining that when a physician translated his findings into a specific RFC, the ALJ could rely upon and adopt this opinion).  Specifically, Dr. Magnus noted that Macek could perform simple tasks.  The jobs that required the least amount of reasoning involved one or two step routine tasks.  *See Dictionary of Occupational Titles, Appendix C- Components of the Definitional Trailer*, 1991 WL 688702.  Therefore, the ALJ did not err by interpreting Dr. Magnus' opinion that Macek could perform simple tasks to mean that Macek could perform tasks that involved simple one or two step routine tasks.  However, Dr. Magnus also concluded that Macek had a moderate limitation in completing a normal workday or workweek without psychological interruptions.  The ALJ did not acknowledge this opinion in her decision.  It is not clear what effect, if any, this moderate limitation would have on Macek's ability to perform simple one and two step tasks on a consistent basis and in a manner that would lend itself to performing gainful activity.  The ALJ must provide further explanation on remand.

Macek also complains that there was a conflict between the VE's testimony and the

DOT. The ALJ is responsible for investigating and resolving any apparent conflicts between the VE's testimony and the DOT. **SSR 00–49**; *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011). Provided there is no apparent conflict between the VE's testimony and the DOT, the ALJ may rely on the VE's confirmation that the testimony is consistent with the DOT. *Weatherbee*, 649 F.3d at 570. Under some circumstances, the ALJ is free to accept the VE's testimony when it conflicts with or exceeds the specifications provided in the DOT. *See Eaglebarger v. Astrue*, 2012 WL 602022, *7 (N.D. Ind. Feb. 23, 2012) (citing *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir.2008) ("An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors....")). Experience, knowledge, education, and training are all sufficient bases on which the ALJ may adopt the VE's opinion that conflicts with or exceeds the purviews of the DOT. *Eaglebarger,* 2012 WL 602022 at *8. The ALJ satisfies her duty when she questions whether the VE's answer is consistent with the DOT and receives an affirmative answer, even if the VE's response partially is based on his experience, provided there are no apparent inconsistencies that the ALJ must further resolve.

Macek argues that the jobs the VE identified in response to the hypothetical restricting the claimant to work that required the performance of one-to-two step tasks had a Reasoning level of two per the DOT.  An individual performing a job that has a reasoning level of two must be able to "(a)pply commonsense understanding to carry out detailed but uninvolved written or oral instructions."  *Dictionary of Occupational Titles, Appendix C- Components of the Definitional Trailer*, 1991 WL 688702.  The DOT states that jobs that involve one-to-two step tasks have a reasoning level of one.  *Dictionary of Occupational Titles, Appendix C-*

*Components of the Definitional Trailer*, 1991 WL 688702.

The Commissioner argues that this is not an apparent conflict, citing to ***Terry v. Astrue***, 580 F.3d 471, 478 (7th Cir. 2009).  In ***Terry***, the Seventh Circuit determined that there was no apparent conflict between the ALJ's limitation to simple work and the jobs identified by the VE that required a reasoning level of 3.  ***Terry***, 580 F.3d at 478.  However, the conflict here is more apparent than in ***Terry***.  The ALJ did not just limit Macek to simple work.  Rather, she specifically stated that Macek could not perform work that required more than one-or-two step instructions, which is the same language used to describe level one.  Therefore, there was a direct conflict between the VE's testimony and the DOT, and the ALJ must reconsider whether there are jobs Macek is capable of performing that fall into the level one range for reasoning development due to her limitation to simple one-to-two step routine tasks.

Macek next argues that the ALJ failed to give appropriate weight to the opinions of his treating physicians.   A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record**. 20 C.F.R. § 404.1527(d)(2);** *See also **Schmidt v. Astrue,*** 496 F.3d 833, 842 (7th Cir. 2007); ***Gudgell v. Barnhart***, 345 F.3d 467, 470 (7th Cir. 2003).  The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford v. Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (quoting ***Scivally v. Sullivan***, 966 F.2d 1070, 1076 (7th Cir. 1992)); *See also* **20 C.F.R. § 404.1527(d)(2)** ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

28

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. **20 C.F.R. § 404.1527(c)(2);** *Clifford,* 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *Schmidt*, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); see e.g. *Latkowski v. Barnhart*, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); *Jacoby v. Barnhart*, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits...[and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted).

Macek criticizes the ALJ's assessment of Dr. Gandhi's opinion on several grounds. First, he argues that the ALJ erred by stating that Dr. Gandhi's opinion that Macek had not been able to work since November 2008 was due to his mental problems was contrary to Macek's testimony that he stopped working due to back pain. The ALJ was not incorrect to point out that Dr. Gandhi's statement was contrary to Macek's own. This was a true statement of the evidence of record and was not the only inconsistency on which the ALJ based her opinion.

Macek also complains that the ALJ should not have relied on the inconsistency between

Dr. Gandhi's opinion that Macek resorted to drinking to self-medicate and Macek's testimony that he had been sober for two years. Macek argues that Dr. Gandhi was providing an overall history of Macek's issues. However, upon review of the record this is not entirely clear. Dr. Gandhi's opinion was written in the present tense, indicating that he believed Macek's alcohol dependence was ongoing. Regardless, this reflects an inconsistency between Macek's condition at the time of the hearing and Dr. Gandhi's assessment. Clearly, Macek's alcohol dependence was not affecting him at the time of the ALJ's decision, and the ALJ did not need to take alcohol dependence into account.

Finally, Macek argues that the ALJ was "cherry-picking" the evidence by relying the GAF score given by the consultative physician, Dr. Walters, over those given by Dr. Gandhi and Molenaar. Both of Macek's treating sources gave similar GAF scores. Dr. Gandhi assigned a score of 35 and Molenaar assigned a score of 32. However, Dr. Walters found Macek's GAF score to be much greater and assigned a score of 60. Macek further contests that the ALJ should not have rejected Dr. Gandhi's GAF score because he assigned a score of 35 during out patient counseling although Macek's GAF score was 40, indicating less serious symptoms, at the time he was hospitalized. Macek points out that his hospitalization was voluntary and thus not telling of the seriousness of his symptoms.

The court does not find that the ALJ erred in pointing out this inconsistency. Although the ALJ thought it was "noteworthy" that the GAF scores were different and that Dr. Gandhi assigned a lower score at his examination than Macek received when he was hospitalized, this is an accurate depiction of the evidence of record, and the ALJ did not base her entire explanation on these inconsistencies. Rather, the ALJ went on to explain that the GAF scores Dr. Gandhi

30

assigned were inconsistent with the evidence as a whole.  The ALJ pointed to Macek's normal

mental status examination results, the lack of other inpatient treatment from Dr. Gandhi, and the

fact that Macek's medication remained consistent.  The ALJ adequately supported her finding by

considering the record as a whole and pointing to numerous portions of the evidence, and for this

reason, the court does not find that the ALJ "cherry-picked" the evidence to support her

conclusion.

Macek further argues that even if the ALJ did not give controlling weight to the treating

sources, she should have given their opinions great weight.  Macek refers the court to SSR 96-

2p, which states:

> Adjudicators must remember that a finding that a treating source medical opinion
> is not well-supported by medically acceptable clinical and laboratory diagnostic
> techniques or is inconsistent with the other substantial evidence in the case record
> means only that the opinion is not entitled to 'controlling weight,' not that the
> opinion should be rejected. Treating source medical opinions are still entitled to
> deference and must be weighed using all of the factors provided in 20 CFR
> 404.1527 and 416.927. In many cases, a treating source's medical opinion will be
> entitled to the greatest weight and should be adopted, even if it does not meet the
> test for controlling weight.

The Commissioner argues that Macek ignored the ALJ's repeated notation that Dr.

Gandhi did not provide treatment notes.  It is the Commissioner's position that "[t]he better an

explanation a source provides for an opinion, the more weight we will give that opinion."  *See* **20**

**C.F.R. § 404.1527(d)(3).**  Macek responds that the ALJ should have requested the treatment

notes from Dr. Gandhi, and by failing to do so, did not satisfy her duty.

Title 20 C.F.R. § 404.1512(e)(1) states that

> We will first recontact your treating physician or psychologist or other medical
> source to determine whether the additional information we need is readily
> available. We will seek additional evidence or clarification from your medical

31

> source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

An ALJ is required to try to obtain additional evidence when "the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled." **20 C.F.R. § 404.1527(c)(3).** "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." ***Skarbek v. Barnhart***, 390 F.3d 500, 504 (7th Cir.2004). *See also,* ***Barnett v. Barnhart***, 381 F.3d 664, 669 (7th Cir.2004) ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable."). However, the ALJ must make every reasonable effort to contact treating sources when the bases for their opinions is not clear to the ALJ or the opinion contains insufficient information on which to rule. SSR 96-5p. *See also* ***Marlow v. Barnhart***, 2005 WL 2562652, *11-12 (N.D. Ill. Oct. 13, 2005).

The ALJ mentioned several times throughout her opinion that Dr. Gandhi and Molenaar did not provide their treatment notes. One of the factors the ALJ must weigh in determining how much weight to give the treating physicians is the "supportability of the medical opinion". *See* **20 C.F.R. § 404.1527(d)(1)-(6).** Without considering the treatment records of Macek's treating physicians, it is difficult to fathom how the ALJ could have understood the bases of their opinions. Furthermore, the ALJ's repeated mention of the absence of the treatment notes suggests that their review may have weighed on her opinion. It appears that the record did not contain all the necessary information and that the ALJ did not re-contact Macek's treating sources to elicit their treatment records. On remand, the ALJ must make a reasonable effort to

obtain and consider Dr. Gandhi and Molenaar's treatment records.

Overall, the ALJ's decision was well-supported and explained.  She identified inconsistencies and pointed to treatment that was inconsistent with the treating sources' opinions.  Although Macek complains that each consideration on its own is insufficient to give less than controlling or great weight to his treating sources' opinions, when considered in their totality, the ALJ provided sufficient support for her conclusion.

Based on the foregoing reasons, the decision of the Commissioner is **REMANDED.**

ENTERED this 27th day of September, 2013

/s/ Andrew P. Rodovich
United States Magistrate Judge

33